UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────────

JACQUELYN WHITE,

                     Plaintiff,              08 Civ. 0993 (JGK)

          - against -

                                             OPINION AND ORDER

DEPARTMENT OF CORRECTIONAL SERVICES
("DOCS"), ET AL.,

                     Defendants.
────────────────────────────────────

JOHN G. KOELTL, District Judge:

     The plaintiff, Jacquelyn White, a female correction officer

at the Lincoln Correctional Facility in New York City

("Lincoln"), brings this employment discrimination action

against New York State, the New York State Department of

Correctional Services ("DOCS"), and individual defendants Joseph

Williams, Nicholas Brocco, Salvatore Munafo, Ronald Haines,

George Van Valkenburg, and Robert Murray, all of whom were

employed by DOCS as supervisory officers at Lincoln during the

relevant time period.  The individual defendants are being sued

in their individual capacities.

     The plaintiff alleges that defendants New York State and

DOCS discriminated against her on the basis of gender in

violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e, et seq. ("Title VII").  The plaintiff also

asserts a claim of retaliation in violation of Title VII against

1

these defendants.  In addition, the plaintiff asserts a claim under 42 U.S.C. § 1983 against the individual defendants claiming a violation of her Fourteenth Amendment right to equal protection resulting from gender discrimination.

The defendants move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing all causes of action against them.

**I.**

The standard for granting summary judgment is well established.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.  The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the

2

absence of a genuine issue of material fact." Celotex, 477 U.S. at 323.  The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Behringer v. Lavelle Sch. For the Blind, No. 08 Civ. 4899, 2010 WL 5158644, at *1 (S.D.N.Y. Dec. 17, 2010).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654 (1962)); see also Gallo, 22 F.3d at 1223.  Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party.  See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).  If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible . . . ." Ying Jing Gan v. City of N.Y., 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998) (collecting cases); Behringer, 2010 WL 5158644, at *1.

## II.

The following facts are undisputed unless otherwise noted.

### A.

The plaintiff is a female correction officer who began her employment with DOCS in 1986 at Bedford Hills Correctional Facility. (Am. Compl. ¶ 22.) In 1992, she transferred to Lincoln where, at all relevant times, she held the job post of Relief Officer for the Release Process Booth and Officer in Charge Post.[1] (Am. Compl. ¶¶ 22-23.) The plaintiff worked the 7 a.m. to 3 p.m. shift. (Pl.'s Counter Stmt. of Facts ¶ 4.)

### B.

On May 3, 2006, Lincoln posted a job for assignment entitled Release Process Booth/Officer in Charge, Post No. 0031, Tour II, Squad 8 ("the 2006 OIC position"). (Defs.' 56.1 Stmt. ¶ 33; Pl.'s 56.1 Stmt. ¶ 33.) The posting occurred after the former OIC, Correction Officer Marrero, retired around April 2006. (Defs.' 56.1 Stmt. ¶ 14; Pl.'s 56.1 Stmt. ¶ 14.) The job was posted for thirty days and specified that "male Correction Officers only" were permitted to bid for the post. (Defs.' 56.1 Stmt. ¶ 34; Pl.'s 56.1 Stmt. ¶ 34; Dawkins Decl. Ex. C.) The

---

[1] The plaintiff has also described this job post as Second Officer in the Processing Booth. (Pl.'s Counter Stmt. of Facts ¶ 3.)

plaintiff alleges that, after Officer Marrero retired and approximately one month prior to the posting of the position, the job was offered to a female officer, Cokramer McBride, who had less seniority than the plaintiff.  (Pl.'s Counter Stmt. of Facts ¶ 25; Dawkins Decl. Ex. E.)  Officer McBride turned the job down.  (Decl. of Rocco Avallone in Opp. to Defs.' Mot. for Summ. J. ("Avallone Decl.") Ex. A ("Pl.'s Dep.") at 72.)

The job requirements listed for the posting included, among other tasks: accounting for equipment, receiving briefing from previous tours, issuing inmate identification cards, and checking inmate rosters.  (Dawkins Decl. Ex. C.)  The posting also stated that the OIC would be required to "take and/or ensure that Urines are taken."  (Dawkins Decl. Ex. C.)

Despite the posting's request for only male correction officers, the plaintiff applied for the position on May 3, 2006. (Defs.' 56.1 Stmt. ¶ 40.)  The plaintiff testified that she sought the job because it allowed for weekends off and carried a higher position of authority.  (Pl.'s Dep. 54.)  However, the plaintiff's application was denied on June 3, 2006 and marked with the notations "unsuccessful" and "not allowed."  (Defs.' 56.1 Stmt. ¶ 40; Pl.'s 56.1 Stmt. ¶ 40.)  The position was awarded to Correction Officer Holland, a male officer with higher seniority than the plaintiff.  (Defs.' 56.1 Stmt. ¶ 42; Pl.'s 56.1 Stmt. ¶ 42.)  The collective bargaining agreement

between DOCS and the Union requires that job assignments be made in accordance with seniority.  (Dawkins Decl. Ex. KK.)

Prior to the posting of the 2006 OIC position, female officers had been allowed to bid for the OIC position.  (Defs.' 56.1 Stmt. ¶ 21; Pl.'s 56.1 Stmt. ¶ 21.)  Indeed, female officers had been awarded bids as OICs in the past.  (Defs.' 56.1 Stmt. ¶ 21; Pl.'s 56.1 Stmt. ¶ 21.)  The plaintiff herself had worked the OIC position many times when the officer who permanently held the position was on vacation or if she needed to swap with him.  (Pl.'s Counter Stmt. of Facts ¶ 14.)

C.

The defendants claim that the decision to re-designate the position as male-only was due to changing demographics at Lincoln that resulted in a shortage of male officers.  Inmates at Lincoln are permitted to leave the institution for work release or home furloughs and, upon return, are subject to strip frisks and urine collection. (Dawkins Decl. Ex. FF ("Brocco Decl.") ¶ 4.)  DOCS policies state that strip frisks and urine tests must be conducted by officers who are of the same sex as the inmates.  (Defs.' 56.1 Stmt. ¶¶ 38, 39; Pl.'s 56.1 Stmt. ¶¶ 38, 39.)  Therefore, when female officers worked the OIC position in the past, a male officer would be called in to

perform a strip frisk or urine test when the need arose.
(Defs.' 56.1 Stmt. ¶ 24; Pl.'s 56.1 Stmt. ¶ 24.)

The defendants argue that there were so few male officers
at Lincoln that it became extremely difficult to conduct urine
tests and strip frisks when females were working the OIC post.
According to the defendants, over fifty percent of the officers
at Lincoln were female in 2006 and, by 2007, the number had
risen to sixty percent.  (Defs.' 56.1 Stmt. ¶ 13.)  Four
officers staff Lincoln's inmate processing area, with two
working at the processing booth and two at the processing gate.[2]
(Defs.' 56.1 Stmt. ¶ 17; Pl.'s 56.1 Stmt. ¶ 17.)  The defendants
assert that the only male officers working the 7 a.m. to 3 p.m.
shift were one permanent bid officer[3] and one male resource
officer and that both had limited availability to conduct urine
tests and strip frisks due to work obligations that frequently
required them to travel outside Lincoln.  (Defs.' 56.1 Stmt. ¶¶
18-20.)  The defendants allege that, as a result, officers from
outside the processing area frequently had to be called in to

---

[2] The officers working in the processing area included both
permanent bid officers and resource officers.  A permanent bid
officer cannot be reassigned to a different post once the bid
has been awarded.  Officers not serving a bid post are called
resource officers and can be reassigned as the needs of the
facility dictate.  (Defs.' 56.1 Stmt. ¶ 16.)

[3] The plaintiff contends that two of the permanent bid positions
were held by men.  (Pl.'s 56.1 Stmt. ¶ 18.)

conduct the strip frisks or urine tests, which created serious logistical difficulties.

Defendant Brocco testified that he considered several possible means of addressing the shortage of male officers. First, after viewing a list of officers scheduled to transfer into Lincoln in 2006 that indicated that eight of the ten officers were female, he asked the personnel office in Albany for permission to hire officers not on this list. (Brocco Decl. ¶ 6.) However, permission to do so was denied. (Brocco Decl. ¶ 6.) Next, he asked the Assistant Commissioner's office for permission to hire male officers on overtime but was told he could not. (Brocco Decl. ¶ 6.) Finally, he consulted the DOCS Labor Relations and Human Resources Departments, as well as the Director of the Office of Diversity Management, about designating the OIC position male-only and ultimately obtained approval to do so. (Brocco Decl. ¶ 10.)

D.

On June 21, 2006, the plaintiff filed a grievance with the union challenging the designation of the OIC position as male-only. (Defs.' 56.1 Stmt. ¶ 43; Pl.'s 56.1 Stmt. ¶ 43.) The grievance was denied on November 22, 2006. (Defs.' 56.1 Stmt. ¶ 44; Pl.'s 56.1 Stmt. ¶ 44.)

In July 2006, the plaintiff filed a gender discrimination complaint with the New York State Division of Human Rights ("NYSDHR") that was cross-filed with the Equal Employment Opportunity Commission (the "EEOC"), claiming that she was denied the job because of her gender.  (Defs.' 56.1 Stmt. ¶ 46; Pl.'s 56.1 Stmt. ¶ 46.)

On April 18 2007, the plaintiff sent a letter to union steward Holland complaining about gender discrimination and the designation of the OIC position as male-only.  (Defs.' 56.1 Stmt. ¶ 45; Pl.'s 56.1 Stmt. ¶ 45; Dawkins Decl. Ex. M.)  Joseph Williams, Superintendent of Lincoln, was copied on the letter. (Dawkins Decl. Ex. M.)

On September 18, 2007, the NYSDHR found no probable cause to believe that DOCS had engaged in the unlawful discriminatory practices alleged by the plaintiff.  (Defs.' 56.1 Stmt. ¶ 48; Dawkins Decl. Ex. E.)  The NYSDHR concluded that the designation of the OIC position as male-only was "suspect and not consistent with the actual work being done by female Correctional Officers."  (Dawkins Decl. Ex. E.)  However, it found determinative that the plaintiff had less seniority than the officer who received the position.  (Dawkins Decl. Ex. E.)  On October 29, 2007, the EEOC issued a right-to-sue letter to the plaintiff.  (Defs.' 56.1 Stmt. ¶ 49; Pl.'s 56.1 Stmt. ¶ 49.)

E.

Between May and September 2007, the plaintiff was subjected to several disciplinary measures by her employer.

The first disciplinary measure was a Notice of Discipline ("NOD") issued on May 29, 2007.  (Defs.' 56.1 Stmt. ¶ 65; Pl.'s 56.1 Stmt. ¶ 65; Dawkins Decl. Ex. N.)  The NOD arose from an incident in April 2007 where defendant Haines alleged that the plaintiff left her post without authorization and was found in the Release Processing Booth, where she was not allowed. (Defs.' 56.1 Stmt. ¶ 66; Pl.'s 56.1 Stmt. ¶ 66; Dawkins Decl. Ex. L.)  Defendant Haines also accused the plaintiff of insubordination for failing to leave the Release Processing Booth area in a timely manner and for speaking back to him. (Defs.' 56.1 Stmt. ¶ 66; Pl.'s 56.1 Stmt. ¶ 66.)  The NOD recommended a penalty of dismissal from service and loss of accrued annual leave.  (Dawkins Decl. Ex. N.)  A few days after the NOD was issued, the plaintiff filed a grievance through her union concerning the disciplinary action.  (Defs.' 56.1 Stmt. ¶ 67; Pl.'s 56.1 Stmt. ¶ 67.)  The grievance was initially denied, and the union appealed the decision.  (Defs.' 56.1 Stmt. ¶¶ 68, 69; Pl.'s 56.1 Stmt. ¶¶ 68, 69.)  In May 2008, the NOD was settled after the plaintiff agreed to pay a $3000 fine.  (Defs.' 56.1 Stmt. ¶ 69; Pl.'s 56.1 Stmt. ¶ 69.)  The NOD and the

settlement agreement were placed in the plaintiff's personal history folder. (Dawkins Decl. Ex. N.)

The second disciplinary action occurred on June 15, 2007, when defendant Van Valkenburg issued a formal counseling letter to the plaintiff alleging that she had falsified records based on an entry she made in the processing area logbook. (Defs.' 56.1 Stmt. ¶ 71; Pl.'s 56.1 Stmt. ¶ 71; Dawkins Decl. Ex. O.) In July 2007, defendant Brocco informed the plaintiff that he would not remove the counseling letter from her personnel folder. (Defs.' 56.1 Stmt. ¶ 72; Pl.'s 56.1 Stmt. ¶ 72.)

The third disciplinary action occurred in August 2007, when defendant Haines issued a formal counseling memorandum to the plaintiff for allegedly allowing an inmate to leave Lincoln without proper authorization. (Defs.' 56.1 Stmt. ¶ 74; Pl.'s 56.1 Stmt. ¶ 74; Dawkins Decl. Ex. R.)

In September 2007, the plaintiff received an "Excellent Performance Rating" from her immediate supervisor, Sergeant Wilson, for her performance from May 19, 2006 to May 19, 2007. (Avallone Decl. Ex. N.) In the section for "second level supervisory review," defendant Murray stated that "[w]hile Officer White may have the capacity to be an excellent officer, she appears to be more intent in creating disharmony in her workplace." (Defs.' 56.1 Stmt. ¶ 87; Pl.'s 56.1 Stmt. ¶ 87.)

On September 23, 2008, the plaintiff filed a separate
complaint with the NYSDHR alleging retaliation as a result of
her July 2006 discrimination complaint with the NYSDHR. (Defs.'
56.1 Stmt. ¶ 95; Pl.'s 56.1 Stmt. ¶ 95; Dawkins Decl. Ex. W.)

F.

Officer Holland, who was awarded the 2006 OIC position,
retired in December 2007. (Defs.' 56.1 Stmt. ¶ 78; Pl.'s 56.1
Stmt. ¶ 78.)  The OIC position was again posted for a thirty-day
period beginning on December 5, 2007 with the notation "for bid
by male Correction Officers only." (Defs.' 56.1 Stmt. ¶ 79;
Pl.'s 56.1 Stmt. ¶ 79; Dawkins Decl. Ex. T.)  The plaintiff
applied for the post on December 7, 2007 and again on January
20, 2008 after the position was reposted (the "2008 OIC
position"). (Defs.' 56.1 Stmt. ¶¶ 80-82; Pl.'s 56.1 Stmt. ¶¶
80-82.)  The plaintiff's applications were denied and marked
"unsuccessful" and "due to the job being male only." (Defs.'
56.1 Stmt. ¶¶ 80, 82; Pl.'s 56.1 Stmt. ¶¶ 80, 82.)  On March 6,
2008, the OIC position was awarded to Officer Rodriguez, a male
officer with lower seniority than the plaintiff. (Defs.' 56.1
Stmt. ¶ 83; Pl.'s 56.1 Stmt. ¶ 83.)

G.

On January 13, 2008, the plaintiff filed her complaint in
this Court.  The complaint originally alleged seven causes of

action.  On March 28, 2009, the defendants' motion to dismiss
was granted in part, dismissing without prejudice the
plaintiff's hostile work environment claim, due process claim,
First Amendment claim, and claims under the New York State
Constitution.  The plaintiff also withdrew her negligent hiring
and breach of contract claims in her opposition papers to the
motion to dismiss and at oral argument, respectively.  The
plaintiff filed an amended complaint on April 29, 2009.  The
amended complaint asserts claims of gender discrimination and
retaliation under Title VII and claims under § 1983 for
violation of her constitutional rights to equal protection,
procedural due process, and free speech.  However, the plaintiff
subsequently withdrew her procedural due process and First
Amendment § 1983 claims in her opposition papers to the motion
for summary judgment and at oral argument,[4] respectively.


### III.

    The defendants seek summary judgment dismissing the
plaintiff's Title VII claim.[5]  The defendants concede that their

---

[4] (Sept. 7, 2011 Hr'g Tr. ("Tr.") at 19.)

[5] It was initially unclear whether the plaintiff's Title VII
claim concerned only the denial of the 2006 OIC position or also
denial of the 2008 OIC position.  At oral argument on this
motion, the plaintiff's counsel stated that the Title VII claim
did not concern the 2006 OIC position but only the 2008 OIC
position.  (Tr. at 10.)  He conceded that, because the 2006 OIC

hiring policy excluded females from the OIC position[6] but argue
that this gender-based policy was justified because sex was a
bona fide occupational qualification ("BFOQ") for the OIC
position.[7]  Under § 703(e)(1) of Title VII, an employer may
discriminate on the basis of "religion, sex, or national origin

---

position was given to an officer who was more senior than the
plaintiff, the plaintiff would not have received the position
even in the absence of any alleged discrimination.  (Tr. at 9.)
Although the plaintiff did not file a complaint with the EEOC
concerning the denial of the 2008 OIC position, counsel for the
defendants stated at oral argument that they were not arguing
that the plaintiff's claim was precluded because of failure to
exhaust administrative remedies.  (Tr. at 17.)  In any event,
the plaintiff's claim of discrimination concerning the 2008 OIC
position is "reasonably related" to her claim alleged in the
complaint filed with the NYSDHR and cross-filed with the EEOC,
such that the exhaustion requirement is excused for the 2008
claim.  See Deravin v. Kerik, 335 F.3d 195, 200-01 (2d Cir.
2003) (claims not filed with the EEOC are not precluded based on
the exhaustion requirement if they are "reasonably related" to
claims that have been filed with the EEOC); Butts v. N.Y.C.
Dep't of Housing Pres. & Dev., 990 F.2d 1397, 1401-03 (2d Cir.
1993) (claim is "reasonably related" if, inter alia, the conduct
complained of consists of incidents of discrimination "carried
out in precisely the same manner alleged in the EEOC charge"),
superseded by statute on other grounds as stated in Hawkins v.
1115 Legal Serv. Care, 163 F.3d 684 (2d Cir. 1998).

[6] The defendants initially briefed the BFOQ defense in relation
only to denial of the 2006 OIC position.  However, defendants'
counsel clarified at oral argument that they are also asserting
a BFOQ defense in relation to denial of the 2008 OIC position.
(Tr. at 16.)

[7] The plaintiff argues that the defendants waived the BFOQ
defense because it is an affirmative defense that the defendants
were required to plead in their answer to the amended complaint.
However, the defendants asserted a business necessity defense in
their answer (Answer to Am. Compl. ¶ 95), which is similar to a
BFOQ defense, and litigated this issue throughout discovery,
which sufficed to put the plaintiff on notice of this defense
and to avoid prejudice to the plaintiff.

in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise . . . ." 42 U.S.C. § 2000e-2(e)(1).[8]  The BFOQ defense is intended to be an "extremely narrow exception" to the general prohibition of discrimination on the basis of sex. Dothard v. Rawlinson, 433 U.S. 321, 334 (1977); see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW, et al. v. Johnson Controls, Inc., 499 U.S. 187, 201 (1991).  The defendant bears the burden of proof of establishing the defense.  Johnson Controls, 499 U.S. at 200.

The defendants argue that inmates' privacy interests render sex a BFOQ for the OIC position.  The defendants rely upon

_____

[8]  In a typical disparate treatment discrimination case under Title VII, claims of discrimination are analyzed at the summary judgment stage under the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), burden-shifting test.  However, in a BFOQ case, the McDonnell Douglas burden-shifting framework does not apply. See, e.g., Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121-22 (1985) (concluding, in the context of a BFOQ case under the ADEA, that "the McDonnell Douglas test is inapplicable where the plaintiff presents direct evidence of discrimination"); Johnson v. State of N.Y., 49 F.3d 75, 79 (2d Cir. 1995) ("[W]here there is direct evidence that the disparate treatment [is discriminatory] . . . the McDonnell Douglas search for a motive is unnecessary and therefore inapplicable." (citations omitted)); Healey v. Southwood Psych. Hosp., 78 F.3d 128, 131 (3d Cir. 1996) ("[A BFOQ case] should be distinguished from the more typical disparate treatment case, pretextual discrimination, where the familiar procedure set forth in McDonnell Douglas is appropriate.  The McDonnell Douglas test is inapt in this case which involves a facially discriminatory policy.").

<u>Jennings v. New York State Office of Mental Health</u>, 786 F. Supp.
376 (S.D.N.Y. 1992), <u>aff'd</u> 977 F.2d 731 (2d Cir. 1992) (per
curiam), which held that a staffing policy requiring that at
least one treatment assistant assigned to the ward of a state
security hospital be of the same gender as patients on that ward
was a BFOQ.  <u>Id.</u> at 387.  <u>Jennings</u> set forth a three-part test
for determining whether privacy interests give rise to a BFOQ:
(1) the employer must assert a factual basis for believing that
the sex-based hiring policy is necessary to protect the privacy
interests in question; (2) the privacy interests must be
entitled to protection under the law; and (3) there must be no
reasonable alternatives to protect those privacy interests other
than the sex-based hiring policy.  <u>Id.</u> at 380-81.

Neither party disputes that prohibiting female officers
from personally conducting strip frisks and urine tests is
necessary to protect the privacy interests of inmates and that
such privacy interests are entitled to protection.  The dispute
thus turns on whether reasonable alternatives to the gender-
based hiring policy exist that would enable females to perform
the OIC position without infringing on these privacy interests.
In this case, a reasonable jury could find that such
alternatives existed.

To justify a BFOQ defense, an employer must show "a high
correlation between sex and ability to perform job functions."

16

Johnson Controls, 499 U.S. at 202; see also Breiner v. Nevada
Dep't of Corr., 610 F.3d 1202, 1213 (9th Cir. 2010) ("[T]he
particular staffing restriction at issue must match . . . [the
relevant] job functions with a high degree of specificity to be
found reasonably necessary." (internal quotation marks and
citations omitted)).  Here, however, the privacy-related job
functions, namely the urine testing and strip frisks, comprised
only a small part of the job duties of the OIC position.  The
majority of the tasks listed in the job description bear no
relation to privacy, such as accounting for all equipment,
issuing inmate identification cards, checking inmate rosters,
and receiving briefing from other officers.  (Dawkins Decl. Ex.
T.)  Moreover, for those tasks that are privacy-related, the
plaintiff has presented evidence that the OIC was not required
to conduct them personally but only to ensure that they were
conducted.  The job description itself required only that the
OIC "take and/or ensure Urines are taken," and Officer Marrero,
who held the OIC position prior to the 2006 posting, testified
that the OIC "absolutely" was not required to take the urine
samples or conduct the strip frisks personally and that he would
frequently delegate those tasks to other officers.  (Dawkins
Decl. Ex. T; Avallone Decl. Ex. E ("Marrero Dep.") at 8, 15.)
The evidence that the privacy-related job functions were only a
minimal part of the OIC position weakens the defendants' BFOQ

defense.  See, e.g., Henry v. Milwaukee Cnty., 539 F.3d 573, 585
(7th Cir. 2008) (gender-specific hiring policy aimed at same-sex
mentoring of juvenile offenders was not reasonably necessary
with respect to the night shift, where opportunities for
mentoring were minimal).

The plaintiff's claim that she and other female officers
regularly performed the OIC position also undermines the BFOQ
defense.  The plaintiff alleges that she and other female
officers served in the OIC position both over the weekends[9] and
during weekdays if the OIC was sick or on vacation and that
there was never a problem with simply calling in a male officer
to perform strip frisks or urine tests when the need arose.
(Pl.'s Dep. 54-58.)

The defendants concede that female officers have worked the
OIC position in the past (Defs.' 56.1 Stmt. ¶ 21), but they
argue that the male-female staff ratio had changed by 2006, and
even more dramatically by 2008, such that the sex-neutral
alternative of delegating urine tests and strip frisks to male
officers was no longer feasible.  Defendant Munafo testified
that he once had to conduct a strip frisk himself because the
entire 7 a.m. to 3 p.m. shift working at the processing area was

---

[9] It should be noted, however, that the needs of Lincoln differed
over the weekend because there was less inmate movement and
therefore fewer instances where strip searches or urine tests
needed to be conducted.  (Dawkins Decl. Ex. V at 5.)

female.  (Munafo Dep. 12.)  He also stated that, on one
occasion, he had to hire male officers to work overtime solely
to perform strip frisks.  (Munafo Dep. 12.)  Defendant Brocco
testified that there was one instance where a strip frisk could
not be conducted because there was no male officer in the entire
facility.  (Brocco Dep. 13-15.)  However, these assertions are
disputed.  Officer Marrero, who held the OIC position for ten
years prior to the posting of the 2006 OIC position, stated that
he never heard of an instance where officers were given overtime
to conduct strip frisks.  (Avallone Decl. Ex. G ("Marrero
Decl.") ¶ 10.)  He also swore that it would be "unfathomable"
for an occasion to arise where there was no male officer in all
of Lincoln.  (Marrero Decl. ¶ 11.)

     In the face of potential alternatives, gender-based hiring
is only permissible if the defendant makes a strong showing that
such alternatives are not reasonable.  See, e.g., Henry, 539
F.3d at 582 ("The BFOQ defense extends only to those policies
that are 'reasonably necessary to the normal operation' of the
institution.  It does not excuse investigation of and reliance
upon alternatives that involve minor additional costs or
inconveniences." (citing 42 U.S.C. § 2000e-2(e)(1))); Forts v.
Ward, 621 F.2d 1210, 1217 (2d Cir. 1980) (reversing district
court decision granting permanent injunction barring male prison
guards from performing certain duties during night shift on the

grounds that reasonable alternatives to this gender-based employment policy were available).  There are genuine issues of material fact as to whether it remained reasonable in 2008 for female officers to serve as OICs and simply delegate strip frisks and urine tests to male officers when the need arose.

Moreover, the plaintiff alleges that the OIC position was offered to a female officer approximately one month before the position was first designated male-only in 2006.  (Pl.'s Dep. 68-70; Dawkins Decl. Ex. E.)  This weakens the defendants' claim that the needs of the facility had changed so dramatically by 2008 that there was no longer any reasonable alternative but to exclude female officers from the OIC position.  The plaintiff also testified that she and other female officers had been asked to perform the OIC position on a few occasions even after it had been designated male-only, similarly suggesting that the previous delegation approach remained a reasonable alternative to gender-based hiring.  (Pl.'s Dep. 84.)  See, e.g., Henry, 539 F.3d at 582-83 (fact that officers of opposite sex were permitted to guard juveniles during day evinced "inconsistencies in implementation [that] cast a significant doubt" on whether barring opposite-sex officers from night shifts was "reasonably necessary to achieve the institution's goal of protecting the privacy interests of the juveniles"); Westchester Cnty. Corr. v. Cnty. of Westchester, 346 F. Supp. 2d 527, 535 (S.D.N.Y. 2004)

20

(argument that prohibiting male correctional officers from serving in female housing posts was necessary because of safety threat to female inmates was severely undermined by County's subsequent policy reversal revoking this ban).  Based on the inconsistencies between the defendants' decision to offer the OIC position to a woman in 2006 and the defendants' claim that a female could not feasibly perform the job in 2008, a reasonable jury could find that sex was not a BFOQ for the 2008 OIC position.

Because the defendants' hiring policy was facially discriminatory and because a reasonable jury could find that sex was not a BFOQ for the 2008 OIC position, the defendants' motion for summary judgment dismissing the plaintiff's Title VII claim is **denied**.


## IV.

The defendants also seek summary judgment on the plaintiff's Title VII retaliation claim.  To establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1) the plaintiff was engaged in a protected activity; (2) the defendant was aware of this activity; (3) the defendant took adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action, that is, that a retaliatory motive played a part in the

adverse employment action.  Cosgrove v. Sears, Roebuck & Co., 9
F.3d 1033, 1039 (2d Cir. 1993).  Claims of retaliation under
Title VII are analyzed under the same burden-shifting framework
of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973),
employed in Title VII discrimination claims.  See Gorzynski v.
Jetblue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010).  If the
plaintiff establishes the elements of a prima facie case, the
burden of production shifts to the defendant to put forth a
legitimate nonretaliatory reason for the actions in question, at
which point the plaintiff has the opportunity to demonstrate
that the defendant's explanation is false and that retaliation
was a motivating factor in the adverse employment action.  See
Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir.
1996).

The plaintiff contends that the defendants retaliated
against her for engaging in protected activity, namely her
filing of a complaint with the NYSHDR in July 2006, her
complaint to her union in April 2007, and other informal
complaints to her supervisors throughout 2006.  The defendants
assume for the purposes of this motion that the plaintiff
engaged in protected activity and that the defendants were aware
of this activity.  However, they argue that no adverse action
was taken against the plaintiff and, even if adverse action was
taken, there is no causal connection between such actions and

any protected activity.  They also argue that, even if the

plaintiff could establish a prima facie case, the defendants

have met their burden of production by putting forth legitimate

nonretaliatory reasons for their actions that the plaintiff has

failed to rebut.  Each of these arguments is considered in turn.


                                A.

     The defendants contend that the plaintiff has failed to

show that any adverse action was taken against her.

     To establish an adverse action under Title VII's

antiretaliation provision, a plaintiff must show that "a

reasonable employee would have found the challenged action

materially adverse, which in this context means it well might

have dissuaded a reasonable worker from making or supporting a

charge of discrimination." Burlington N. & Santa Fe Ry. Co. v.

White, 548 U.S. 53, 68 (2006).  This standard is broader than

the adverse employment action requirement in the Title VII

discrimination context, because the action in question need not

affect the terms and conditions of employment in order to be

considered adverse.  Id. at 64 (the antiretaliation provision

"is not limited to discriminatory acts that affect the terms and

conditions of employment"); Kessler v. Westchester Cnty. Dep't

of Soc. Servs., 461 F.3d 199, 207 (2d Cir. 2006); Gelin v.

Geithner, No. 06 Civ. 10176, 2009 WL 804144, at *20 (Mar. 26,

2009), aff'd 376 Fed Appx. 127 (2d Cir. 2010) (summary order).
However, "trivial harms" such as "petty slights, minor
annoyances, and simple lack of good manners" are not sufficient
for actionable retaliation claims.  White, 548 U.S. at 68.

The plaintiff points to five actions by the defendants that
she claims were in retaliation for her protected activity: (1) a
notice of discipline in May 2007; (2) a formal counseling letter
in June 2007;[10] (3) a formal counseling memo in August 2007; (4)
a negative comment in the plaintiff's performance evaluation in
September 2007; and (5) denial of the OIC position in January
2008.  (Am. Compl. ¶¶ 43, 45, 47, 49, 51-54.)  The defendants
argue that, even if the notice of discipline constitutes an
adverse action, the other actions do not.  However, a reasonable
jury could find that, at least, the notice of discipline was
itself sufficiently adverse to give rise to an actionable
retaliation claim.  See, e.g., Millea v. Metro N. R.R. Co., Nos.
10-409-cv(L), 10-564-cv (XAP), 2011 WL 3437513, at *6 (2d Cir.
Aug. 8, 2011) (applying the White standard to the FMLA anti-
retaliation provision and concluding that a formal letter of
reprimand is materially adverse because it "can reduce an

---

[10] While the plaintiff's amended complaint alleges that the
counseling letter was issued in May 2007, the record establishes
that the incident that gave rise to the counseling letter
occurred in May but the letter itself was not issued until June.
(Dawkins Decl. Ex. O.)  While a third counseling memo was issued
in March 2007 (Dawkins Decl. Ex. K), the plaintiff does not
appear to allege this as a retaliatory action in her complaint.

employee's likelihood of receiving future bonuses, raises, and promotions, and it may lead the employee to believe (correctly or not) that his job is in jeopardy"); Babcock v. N.Y. State Office of Mental Health, No. 04 Civ. 2261, 2009 WL 1598796, at *22 (S.D.N.Y. June 8, 2009) (refusing to rule as a matter of law that a notice of discipline did not constitute an adverse action).  While some cases have held that a notice of discipline does not constitute an adverse action in the retaliation context, many of these cases have relied on the fact that the plaintiff did not point to any negative consequences arising from the notice of discipline.  See, e.g., Weeks v. N.Y. State Div. of Parole, 273 F.3d 76, 86 (2d Cir. 2001) (notice of discipline could not constitute an adverse employment action where the plaintiff had not described "its effect or ramifications, how or why the effect would be serious, whether it went into any file, or even whether it was in writing"), abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 108-114 (2002);[11] Wright v. Monroe Cmnty. Hosp., No. 09 Civ. 6593, 2011 WL 3236224, at *7 (W.D.N.Y. July 28, 2011) (notices of discipline do not amount to adverse

---

[11] It should also be noted that Weeks was issued before the Supreme Court in White expanded the standard for an "adverse action" as it applies in retaliation cases.  Therefore, to the extent that cases following White have simply cited Weeks for the proposition that, as a matter of law, a notice of discipline is not sufficiently adverse to give rise to an actionable retaliation claim, they are not persuasive.

actions "without attendant negative results").  In this case, in contrast, the plaintiff alleges that the notice of discipline threatened severe consequences such as dismissal from service and loss of accrued annual leave, was placed in her personal history folder, and that she had to pay $3000 to settle the disciplinary action.  (Pl.'s Dep. 109; Dawkins Decl. Ex. N.) See Uddin v. City of New York, 316 Fed. Appx. 4, 5-6 (2d Cir. 2008) (summary order) (finding disciplinary charges materially adverse where they were recorded in plaintiff's personnel file and plaintiff was fined three days' pay).

While the counseling memoranda and negative comment in the plaintiff's performance evaluation may not themselves have amounted to adverse actions, see, e.g., Delaney v. LaHood, No. 07 Civ. 471, 2009 WL 3199687, at *34 (E.D.N.Y. Sept. 30, 2009) (wrongful counseling does not amount to materially adverse action); Ragin v. E. Ramapo Cent. Sch. Dist., No. 05 Civ. 0496, 2010 WL 1326779, at *17 (S.D.N.Y. Mar. 31, 2010), a reasonable jury could find that those actions, in combination with the notice of discipline, would be sufficient to "dissuade[] a reasonable worker from making or supporting a charge of discrimination."  White, 548 U.S. at 68.  Thus, genuine issues

of material fact exist concerning the adverse action element of the plaintiff's prima facie case.[12]

### B.

The defendants also contend that the plaintiff cannot establish a causal connection between any protected activity and the allegedly retaliatory actions taken by the defendants.

A causal connection may be established either directly, through evidence of retaliatory animus directed against the plaintiff by the defendant, or indirectly, by showing that the protected activity was followed closely in time by the adverse action or by other circumstantial evidence. See Johnson v. Palma, 931 F.2d 203, 207 (2d Cir. 1991) (citing DeCintio v. Westchester Cnty. Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987)); Manoharan v. Columbia Univ., 842 F.2d 590, 593 (2d Cir. 1998). The defendants assert that the temporal proximity between the plaintiff's complaint with the NYSDHR in July 2006 and the first allegedly retaliatory action (the NOD) in May 2007 is too attenuated to support an inference of causal connection. However, the plaintiff engaged in protected activity as late as

---

[12] It would be difficult to conclude that the denial of the OIC post to the plaintiff in January 2008 was in retaliation for her prior complaints about discrimination.  The posting was limited to males, and it had been limited to males since May 2006, before the plaintiff ever began to complain about gender discrimination.

April 2007, when she complained to her union steward regarding
gender discrimination, a communication on which defendant
Williams was copied in his capacity as superintendent of
Lincoln.[13]  (Dawkins Decl. Ex. M.)  While the defendants argue
that this complaint was merely a repetition of the NYSDHR
charge, the plaintiff's choice to renew her complaints of gender
discrimination in a different forum could have served as an
independent source of retaliatory animus on the part of the
defendants.  See Treglia v. Town of Manlius, 313 F.3d 713, 721
(2d Cir. 2002) (treating plaintiff's filing of a complaint with
NYSDHR and plaintiff's discussion of NYSDHR investigation with
other members of the police department as two separate instances
of protected activity for purposes of calculating temporal
proximity).

When the complaint to the union is treated as protected
activity, the temporal proximity to the issuance of the notice
of discipline is a little over one month.[14]  While the Court of

---

[13] Counsel for the defendants agreed at oral argument that they
were not disputing the defendants' awareness of the complaint to
the union, because DOCS was copied on the letter the plaintiff
sent.  (Tr. at 3-4.)

[14] It should be noted that defendant Brocco's submission of the
request for the notice of discipline predated the plaintiff's
complaint to the union by one day.  (Dawkins Decl. Exs. L, M.)
While the notice of discipline was not issued until May 29,
2007, it was Peter Brown, the Director of Labor Relations based
in Albany, who actually issued it.  (Dawkins Decl. Ex. N.)
Because the employer is at issue in a Title VII retaliation

Appeals for the Second Circuit has not established a bright-line rule as to when the temporal link becomes too attenuated to demonstrate causation, see, e.g., Gorman-Bakos v. Cornell Co-Op Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001); Hill v. Citibank Corp., 312 F. Supp. 2d 464, 480 (S.D.N.Y. 2004), the passage of approximately one month between the protected activity and the retaliation is a sufficiently short period of time for a reasonable jury to determine that the two events were causally connected.  See, e.g., Scheiner v. N.Y.C. Health & Hosps., 152 F. Supp. 2d 487, 497 (S.D.N.Y. 2001) (temporal proximity of one month between protected activity and adverse action supported allegation of causal connection sufficient to survive summary judgment).

Moreover, the plaintiff has presented some evidence from which a reasonable jury could conclude that the defendants harbored retaliatory animus toward the plaintiff.  The plaintiff alleges that defendant Brocco yelled at her and said he did not know what was wrong with her after he learned that she had filed a charge with the EEOC.  (Pl.'s Dep. 98, 100.)  Negative

---

claim, rather than the individual defendants, it is DOCS'
actions that are determinative, regardless of whether the
individuals taking those actions were based in Albany or at
Lincoln.  While the attenuation between the actions of DOCS at
Lincoln and in Albany does weaken the inference of a causal
connection somewhat, the plaintiff has presented sufficient
evidence to raise a genuine issue of material fact with respect
to the causal connection element of the plaintiff's prima facie
case.

reactions by an employer to a plaintiff's complaints of
discrimination have been deemed indicative of retaliatory
animus.  See Mandell v. Cnty. of Suffolk, 316 F.3d 368, 383 (2d
Cir. 2003) (direct evidence of retaliatory animus presented
where supervisor told plaintiff to "keep his mouth shut" after
plaintiff gave interview complaining of discrimination).
Furthermore, Officer Marrero testified that the defendants
intimated that they did not like the plaintiff because she used
the employment manual too often.  (Marrero Dep. 23-24.)
Defendant Murray also inserted a comment into the plaintiff's
otherwise "excellent" performance evaluation focused on her
creation of "disharmony in the workplace."  (Avallone Decl. Ex.
N.)  Complaints by an employer about a plaintiff's "attitude" or
"demeanor" have been considered to be one indicator of
retaliatory animus.  See Mandell, 316 F.3d at 383 (negative
comment in performance evaluation concerning plaintiff's
"attitude" was evidence of retaliatory animus); Cobb v.
Morningside at Home, Inc., No. 06 Civ. 13161, 2009 WL 874612, at
*10 (S.D.N.Y. Mar. 31, 2009) (warnings to plaintiff based not on
her "job performance so much as her demeanor" were indicator of
retaliatory animus).

     The direct evidence of retaliatory animus adduced by the
plaintiff, as well as the temporal proximity between the union
complaint and the notice of discipline, are sufficient to raise

genuine issues of material fact with respect to the causal
connection element of the plaintiff's prima facie case.

C.

Because the plaintiff has presented sufficient evidence to
carry the minimal requirement of a prima facie case, the burden
of production shifts to the defendants to provide a legitimate,
non-retaliatory reason for the adverse actions.  The defendants
have met this burden.  They point to several violations of DOCS
policies committed by the plaintiff that they allege resulted in
the notice of discipline and the counseling memoranda.

However, the plaintiff has presented evidence from which a
reasonable jury could find that the defendants' proffered
reasons for the adverse actions were merely pretextual.  With
respect to the notice of discipline, which the defendants claim
was issued because the plaintiff left her post as a roundsman
and entered the relief processing booth, Officer Marrero
testified that there is no specific assigned post for a
roundsman and that, whenever he performed that position, he was
permitted to enter the processing booth.  (Marrero Dep. 19-22.)
Officer Marrero also stated that he had never heard of anyone
being disciplined for such an infraction.  (Marrero Dep. 21.)

The circumstances surrounding the issuance of the
counseling memoranda are also disputed.  A reasonable jury could

conclude that the counseling memoranda were not justified and that the asserted reasons for issuing them were pretextual.

Because the plaintiff has presented sufficient evidence to carry the minimal requirement of a prima facie case of retaliation and because a reasonable jury could find that the reasons offered for the adverse actions were pretextual, summary judgment is **denied** with respect to the plaintiff's retaliation claim.

## V.

The defendants also seek summary judgment on the plaintiff's § 1983 claims.

### A.

In order to state a claim under § 1983, a plaintiff must allege a violation of a right secured by the Constitution or laws of the United States and must show that the alleged violation was committed or caused by a person acting under the color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988); Gomez v. Toledo, 446 U.S. 635, 640 (1980); Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970); Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004) (citing Atkins, 487 U.S. at 48).  In

this case, the plaintiff alleges a violation of her Fourteenth

Amendment right to equal protection.[15]

The plaintiff alleges that her constitutional right to

equal protection was violated when the defendants discriminated

against her because of her gender[16] by denying her the 2008 OIC

Position.[17]  The Equal Protection Clause protects "public

employees from various forms of discrimination, including

hostile work environment and disparate treatment, on the basis

of gender."  Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir.

2006).  The Second Circuit Court of Appeals applies the Title

VII burden shifting analysis in determining whether conduct was

unlawfully discriminatory under § 1983.  See Annis v. Cnty. of

---

[15] As noted above, the plaintiff has withdrawn her § 1983 claims
based on procedural due process and the First Amendment.

[16] It is unclear from the plaintiff's amended complaint whether
she contends that retaliation for her opposition to
discrimination forms any basis of her equal protection claim.
See Am. Compl. ¶ 78 ("Plaintiff has been deprived of her
Constitutional Rights to be free of discrimination based upon
her gender and sex, and opposition to discrimination and
workplace violations . . . .").  To the extent that the
plaintiff seeks to ground her equal protection claim in
retaliation, such efforts must fail.  See Bernheim v. Litt, 79
F.3d 318, 323 (2d Cir. 1996) ("[W]e know of no court that has
recognized a claim under the equal protection clause for
retaliation following complaints of [] discrimination.");
Sulehria v. City of N.Y., 670 F. Supp. 2d 288, 319 (S.D.N.Y.
2009) (concluding that a retaliation claim is not cognizable
under the Equal Protection Clause).

[17] Counsel for the plaintiff clarified at oral argument that the
§ 1983 equal protection claim only concerned denial of the 2008
OIC position, not the 2006 OIC position.  (Tr. at 10.)

Westchester, 136 F.3d 239, 245 (2d Cir. 1998).  Thus, where a
plaintiff's equal protection claim parallels his or her § 1983
claim, the "elements of one are generally the same as the
elements of the other and the two must stand or fall together."
Feingold, 366 F.3d at 159.  Here, summary judgment has been
denied with respect to the plaintiff's Title VII claim
concerning denial of the 2008 OIC position and thus summary
judgment must also be denied with respect to the plaintiff's §
1983 claim arising from this incident.


                                B.

     The inquiry thus turns to which of the defendants, if any,
were personally involved in this alleged constitutional
deprivation.  "It is well settled in this Circuit that personal
involvement of defendants in alleged constitutional deprivations
is a prerequisite to an award of damages under § 1983." Farrell
v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (quoting Wright v.
Smith, 21 F.3d 496, 501 (2d Cir. 1994)).  Where the officer is a
supervisor, at a minimum, "liability in a § 1983 action depends
on a showing of some personal responsibility, and cannot rest on
respondeat superior." Hernandez v. Keane, 341 F.3d 137, 144 (2d
Cir. 2003); see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1948
(2009); Solar v. Annetts, 707 F. Supp. 2d 437, 441 (S.D.N.Y.

                                34

2010).  In Colon v. Coughlin, 58 F.3d 865 (2d Cir. 1995), the

Second Circuit Court of Appeals held that:

> [t]he personal involvement of a supervisory defendant
> may be shown by evidence that: (1) the defendant
> participated directly in the alleged constitutional
> violation, (2) the defendant, after being informed of
> the violation through a report or appeal, failed to
> remedy the wrong, (3) the defendant created a policy
> or custom under which unconstitutional practices
> occurred or allowed the continuance of such a policy
> or custom, (4) the defendant was grossly negligent in
> supervising subordinates who committed the wrongful
> acts, or (5) the defendant exhibited deliberate
> indifference to the rights of [the plaintiffs] by
> failing to act on information indicating that
> unconstitutional acts were occurring.

Id. at 873.

The Court of Appeals has not yet definitively decided which

of the Colon factors remains a basis for establishing

supervisory liability in the wake of Ashcroft v. Iqbal, 129 S.

Ct. 1937 (2009), which rejected the argument that "a

supervisor's mere knowledge of his subordinate's discriminatory

purpose amounts to the supervisor's violating the Constitution."

Id. at 1949.  Nor has any clear consensus emerged among the

district courts within this Circuit.  See Aguilar v. U.S.

Immigration & Customs Enforcement, No. 07 Civ. 8224, 2011 WL

3273160, at *10 (S.D.N.Y. Aug. 1, 2011); but see Rolon v. Ward,

345 Fed. Appx. 608, 611 (2d Cir. 2009) (summary order) ("A

supervisory official personally participates in challenged

conduct not only by direct participation, but by (1) failing to

take corrective action; (2) creation of a policy or custom
fostering the conduct; (3) grossly negligent supervision, or
deliberate indifference to the rights of others.").   In
particular, district court decisions have differed as to whether
Iqbal nullified any of the Colon factors.   Compare Qasem v.
Toro, 737 F. Supp. 2d 147, 152 (S.D.N.Y. 2010) (finding that
"the five Colon categories supporting personal liability of
supervisors still apply as long as they are consistent with the
requirements applicable to the particular constitutional
provision alleged to have been violated"), with Bellamy v. Mount
Vernon Hosp., No. 07 Civ. 1801, 2009 WL 1835939, at *6 (S.D.N.Y.
June 26, 2009) ("Only the first and part of the third Colon
categories pass Iqbal's muster – a supervisor is only held
liable if that supervisor participates directly in the alleged
constitutional violation or if that supervisor creates a policy
or custom under which unconstitutional practices occurred."),
aff'd 387 Fed. Appx. 55 (2d Cir. 2010) (summary order); see also
Belleza v. Holland, 730 F. Supp. 2d 311, 317 n. 1 (S.D.N.Y.
2010) (noting this split in opinion).

     For the purposes of deciding this motion, however, it is
not necessary for the Court to determine the outer reaches of
supervisory liability, because the plaintiff has failed to
present evidence of personal involvement under any of the Colon
categories for any defendants except Brocco and Williams, and

her claims against them hinge on their direct involvement in the male-only designation of the OIC position.  Direct involvement remains a clear basis for supervisor liability even following Iqbal.  As for defendants Brocco and Williams, the plaintiff has adduced sufficient evidence of their personal involvement to withstand their motion for summary judgment.  Defendant Brocco stated that he discussed the potential male-only designation with the union and with DOCS' Labor Relations and Human Resources Departments, considered possible alternatives to the designation, and obtained the requisite approvals for its implementation.  (Brocco Decl. ¶¶ 6, 7, 10.)  Defendant Williams also testified that he and Defendant Brocco together reviewed and discussed the OIC position's requirements to determine whether the qualifications for the position needed to be altered.  (Dawkins Decl. Ex. CC ("Williams Dep.") at 10-12.)  In conducting this review, defendant Williams discussed the changing male-female ratio at the facility and how that impacted on the job requirements for the OIC position.  (Williams Dep. 11.)  Defendant Williams also attended a meeting with the union in January 2008, where the reasons why the OIC position had been designated male-only were discussed.  (Avallone Decl. Ex. L.)  A reasonable jury could find that both defendant Williams and defendant Brocco were personally involved in the alleged constitutional deprivation at issue.

C.

Defendants Williams and Brocco, however, are entitled to qualified immunity.  Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see, e.g., Iqbal, 129 S. Ct. at 1945-46.  "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  Hunter v. Bryant, 502 U.S. 224, 229 (1991) (per curiam) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

Courts generally perform a two-step analysis to determine whether an official is entitled to qualified immunity.[18]  Saucier v. Katz, 533 U.S. 194, 201 (2001); Loria v. Gorman, 306 F.3d 1271, 1281 (2d Cir. 2002).  First, the Court must undertake a threshold inquiry into whether the plaintiff's allegations, if true, establish a constitutional violation.  Saucier, 533 U.S. at 201.  If the plaintiff's allegations do not state a constitutional claim, "there is no necessity for further inquiries concerning qualified immunity."  Id.  Similarly, if

---

[18]  The Supreme Court has made clear that courts are not required to perform the two steps of the Saucier analysis in any particular sequence.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).

the plaintiff's constitutional claims are procedurally barred,
or have already been disposed of in a motion for summary
judgment, the Court need not reach the question of qualified
immunity.  Second, if a violation could be made out on a
favorable view of the parties' submissions, the next step is to
ask if the right was "clearly established" at the time it was
allegedly infringed.  Id. at 202.  "The relevant, dispositive
inquiry in determining whether a right is clearly established is
whether it would be clear to a reasonable officer that his
conduct was unlawful in the situation he confronted."  Id.

Even where a plaintiff's rights are clearly established,
qualified immunity protects a government official "if it was
'objectively reasonable' for him to believe his actions were
lawful at the time of the challenged act."  Lennon v. Miller, 66
F.3d 416, 420 (2d Cir. 1995).  An official may satisfy the
objective reasonableness test if he demonstrates that "'officers
of reasonable competence could disagree' on the legality of the
defendant's actions."  Id. (quoting Briggs, 475 U.S. at 341).
Thus, if "the only conclusion a rational jury could reach is
that reasonable officers would disagree about the legality of
the defendants' conduct under the circumstances," the defendants
are entitled to summary judgment on qualified immunity grounds.
Id. at 421.  The use of this "objective reasonableness" test

enables courts to decide qualified immunity claims as a matter of law when there are no material issues of disputed fact.  Id.

The plaintiff's equal protection claim has survived dismissal.  The right to be free from gender discrimination was clearly established at the time of the incidents in question.  See Rucci v. Thoubboron, 68 F. Supp. 2d 311, 327 (S.D.N.Y. 1999) ("It is well-settled that the Fourteenth Amendment's protection extends to the right not to be discriminated against because of one's gender.").  However, "the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality" of the designation of the OIC position as male-only.  Lennon, 66 F.3d at 421.  Before taking action, defendants Brocco and Williams reviewed the changing gender demographics at Lincoln and discussed the best course of action to "ensure that we were able to get the duties that were attached to [the OIC post] completed." (Williams Dep. 11.)  Defendant Brocco considered several alternatives before designating the position male-only.  He first asked for permission to hire outside of the list of officers scheduled to transfer into Lincoln.  (Brocco Decl. ¶ 7.)  When such permission was denied, he then attempted to hire male officers on overtime but was also told this was not possible.  (Brocco Decl. ¶ 6.)  It was only when he believed he had exhausted all potential reasonable alternatives that he sought permission to designate the position as male-only.

(Brocco Decl. ¶ 6.)  Because reasonable officers could have believed that there was no reasonable alternative other than the gender-based hiring policy to protect the privacy interests of inmates and that gender was therefore a BFOQ for the OIC position, defendants Brocco and Williams are entitled to qualified immunity.  The defendants' motion for summary judgment on the plaintiff's § 1983 equal protection claim is therefore **granted.**

CONCLUSION

The Court has considered all of the arguments of the parties.  To the extent not specifically addressed above, the remaining arguments are either moot or without merit.  For the foregoing reasons, the defendants' motion for summary judgment is **granted** with respect to the plaintiff's § 1983 equal protection claim but **denied** with respect to the plaintiff's Title VII discrimination and retaliation claims.  The Clerk is directed to close Docket No. 37.


SO ORDERED.

Dated:   New York, New York
         September 3 0, 2011

         _____
                John G. Koeltl
         United States District Judge